UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DIANNA CHANDLER,                    :
                                    :CIVIL ACTION NO. 3:14-CV-867
            Plaintiff,              :
                                    :(JUDGE CONABOY)
            v.                      :
                                    :
CAROLYN COLVIN,                     :
Acting Commissioner of             :
Social Security,                    :
                                    :
            Defendant.              :
                                    :

_____

**MEMORANDUM**

Here we consider Plaintiff's Appeal of Defendant's denial of

Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI") under Titles II and XVI of the Social Security Act

("Act"), 42 U.S.C. §§ 401-433, 1381-1383f.  (Doc. 1.)   The

Administrative Law Judge ("ALJ") who evaluated the claim found that

Plaintiff had the residual function capacity ("RFC") to perform

light work with certain limitations and that such work was

available.  (R. 7-25.)  The ALJ therefore denied Plaintiff's claim

for benefits.  (*Id.*)  With this action, Plaintiff argues that the

determination of the Social Security Administration is error for

three reasons: 1) the ALJ substituted his own opinion for that of

Plaintiff's treating physician; 2) the ALJ failed to explain how he

considered evidence and failed to give her treating physician's

opinion controlling weight; and 3) the ALJ erred in failing to find

Plaintiff and her witness credible.  (Doc. 10 at 7.)  For the

reasons discussed below, we conclude Plaintiff's appeal of the

Acting Commissioner's decision is properly denied.

## I. Background

*A.    Procedural Background*

On September 29, 2010, Plaintiff filed an application for DIB and SSI alleging disability beginning on January 23, 2007.  (R. 74.)  In the December 13, 2010, Disability Report, Plaintiff listed four conditions that rendered her unable to work: 1) two screws in each leg; 2) legally blind in left eye; 3) right eye is at high risk for retina detachment; and 4) manic depressive.  (R. 167.)  The claims were initially denied on April 21, 2011.  (R. 76, 80.)  Plaintiff filed a request for a review before an ALJ on June 16, 2011.  (R. 87.)  On October 19, 2012, Plaintiff, with her attorney and a witness, appeared at a hearing before ALJ Patrick Cutter. (R. 26.)  Vocational Expert Dr. Anderson also testified at the hearing.  (*Id.*)  At the hearing, Plaintiff amended her alleged onset date of disability to December 31, 2010.  (R. 55.)  The ALJ issued his unfavorable decision on November 20, 2012, finding that Plaintiff was not disabled under the Social Security Act during the relevant time period.  (R. 21.)

On January 29, 2013, Plaintiff filed a Request for Review with the Appeal's Council.  (R. 5-6.)  The Appeals Council denied Plaintiff's request for review of the ALJ's decision.  (R. 1-4.) In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 1.)

On May 6, 2014, Plaintiff filed her action in this Court
appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant
filed her answer and the Social Security Administration transcript
on July 7, 2014.  (Docs. 8, 9.)  Plaintiff filed her supporting
brief on August 21, 2014.  (Doc. 10.)  Defendant filed her
opposition brief on September 3, 2014.  (Doc. 11.)  Plaintiff did
not file a reply brief, and the time for doing so has passed.
Therefore, this matter is ripe for disposition.

**B.   *Factual Background***

Plaintiff was born on June 4, 1964.  (R. 19.)  She completed
high school and some college.  (R. 19, 30.)  Plaintiff last worked
three days per week at a gas station in 2010 for a few months.  (R.
38.)  Her last full-time employment was in 2007: she stopped
working in January 2007 because she was away from home a lot, the
job put a strain on her legs, and she had a disabled daughter at
home who had some mental problems and needed someone with her.  (R.
167.)  As noted above, Plaintiff initially claimed disability due
to the following: 1) two screws in each leg; 2) legally blind in
left eye; 3) right eye is at high risk for retina detachment; and
4) manic depressive.  (R. 167.)  At the ALJ hearing, Plaintiff
testified she has agoraphobia, panic attacks, depression, obsessive
compulsive disorder, arthritis, and screws in both legs.  (R. 31.)

**1.   Physical Impairment Evidence**

X-ray evidence from March 1997 shows Plaintiff had a

nondisplaced spiral fracture in the first metatarsal of her right ankle.  (R. 227.)  A radiology report of the left knee dated May 22, 1998, noted evidence of previous surgery with two orthopedic screws in the proximal tibia.  (R. 268.)

Ronald Vandergriff, D.O., performed a consulting orthopedic examination on April 5, 2011.  (R. 296-99.)  Plaintiff reported she was unable to work becuase of pain in both lower extremities, sites where she had surgery.  (R. 296.)  Dr. Vandergriff noted Plaintiff's "Past Surgical History" to be "[l]eft lower extremity tib fib in 1995" and "[r]ight lower extremity proximal tib fib in 2000."  (R. 297.)  Complaining of discomfort and pain with any continual walking, Plaintiff had not seen anyone for the reported problem since surgical followup in 2000.  (R. 296.)  Plaintiff also reported a history of depression for which she was last seen in 2008.  (*Id.*)  At the time of the examination, Plaintiff denied any suicidal or homicidal ideation.  (*Id.*)  Plaintiff was not taking any medication at the time.  (R. 297.)  She also reported that in 2006 an opthalmologist in Kansas diagnosed her as legally blind in one eye and at high risk for rentinal detachment in her right eye.  (*Id.*)  Plaintiff was not seeing anyone for the problem.  (*Id.*)  Plaintiff's "Past Medical History" included depression.  (*Id.*)  A "Physical Description" of Plaintiff included the observation that she was "extremely obese," "odorous of tobacco," and "able to ambulate to and from the exam room and get on and off the

examination table on her own without assistance other than a stepstool." (R. 298.) An x-ray of the right lower extremity taken at the time of the evaluation showed mild arthritic changes in the right knee joint. (R. 298.) Dr. Vandergriff found Plaintiff to be alert, answering questions in an appropriate manner, with normal quantity and quality of speech, calm affect, appropriate mood, intact memory, and logical and coherent thought processes. (R. 299.) He recorded the following "Diagnosis/Impression": bilateral surgical intervention of proximal tib fib; history of depression; legal blindness in left eye; risk of retinal detachment of right eye "per claimant," and exophthalmus. (*Id.*) Dr. Vandergriff made the following recommendations: Plaintiff should be seen by an orthopedic surgeon for evaluation and further testing of her legs; Plaintiff should be seen by a psychiatrist due to her history of depression; Plaintiff should be seen by an opthalmologist for an evaluation of her eyes; and she should have certain laboratory tests done. (*Id.*) He did not complete the physical limitation form. (R. 301-02.)

## 2. **Mental Impairment Evidence**

On April 7, 2011, Stanley E. Schneider, Ed.D., performed a consulting psychological evaluation. (R. 303-11.) Plaintiff related to Dr. Schneider that she had been fired from her job at the gas station for stealing five dollars, explaining that she took the money to get something to eat and intended to pay it back. (R.

303.)  When asked why she was applying for disability, Plaintiff
said she had been through several jobs and had trouble completing
them, reporting that she had no motivation and referring to
problems sitting and standing for any length of time.  (R. 304.)
Plaintiff reported that she had been diagnosed with bipolar
disorder in 1995 and had tried to end her life three  times--the
first in 1995 and the last two years before the evaluation.  (*Id.*)
Plaintiff also reported a history of anxiety and compulsive
behavior, and she did not like to leave the house because of the
way she felt when around other people.  (*Id.*)  She was not
receiving any mental health treatment at the time.  (R. 305.)
Plaintiff stated that she was previously taking Paxil, Zoloft, and
Seroquel, which offered some relief, but she had no money and could
not afford her medications.  (*Id.*)  When asked if she believed she
could work, Plaintiff responded that she probably could work at a
sedentary job with the allowance to get up and move around.  (*Id.*)
Plaintiff also reported she had been sexually molested by her
father beginning at age fifteen and ending when she was 16, and she
had sometimes been subject to bullying.  (*Id.*)  Although Plaintiff
reported that she does not like to interact with or relate to
people, she said she related acceptably with supervisors.  (R.
306.)  Dr. Schneider recorded that Plaintiff was "highly
distressed" throughout his assessment--she was very anxious,
nervous and tense.  (R. 306.)  Plaintiff regularly had suicidal

ideations, but denied intent or plan.  (R. 307.)  Dr. Schneider diagnosed Plaintiff with bipolar disorder and general anxiety disorder.  (R. 308.)  He opined that Plaintiff's prognosis was poor and she would benefit from medication.  (R. 307.)  He found that Plaintiff had between moderate and marked limitations in the following areas: her ability to understand and remember detailed instructions; her ability to interact appropriately with the public; and her ability to respond appropriately to changes in a routine work setting.[1]  (R. 310.)  In other areas of functioning, Plaintiff was found to have slight to moderate limitations.  (R. 310-11.)

On April 20, 2011, with evidence which included the reports of Dr. Vandergriff and Dr. Schneider (R. 59), state agency consultant Jonathan Rightmyer, Ph.D., found that Plaintiff had mild restrictions in activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace. (R. 61.)  Dr. Rightmyer found Plaintiff had no repeated episodes of decompensation, each of extended duration.  (*Id*.)  He further noted that Plaintiff reported no suicidal ideation to Dr. Vandergriff but reported continuous suicidal thoughts to Dr. Schneider.  (*Id*.)

On September 20, 2011, and September 27, 2011, Plaintiff was seen at The Stevens Center.  (R. 317-23.)  Henry Wehman, M.D., is

---

[1]  Rather than checking a specific block as directed, Dr. Schneider checked between blocks.  (*See* R. 310-11.)

7

listed as the principal psychiatrist.  (R. 317, 321.)  Rose Holland performed the September 20, 2011, assessment.  (R. 326.) Presenting problems were identified as depression, anxiety, and trauma.  (*Id.*)  Plaintiff's strengths were noted to be "persistent, kind, intelligent, hobbies - plays on computer."  (R. 317.)  At the time, Plaintiff reported crying a lot, irritability, pulling at eyebrows when she was anxious, worrying about finances, and sleep problems.  (*Id.*)  Plaintiff's "current" diagnosis was Major Depressive Disorder, Severe, Generalized Anxiety Disorder, and Post Traumatic Stress Disorder.  (R. 317, 321.)  Plaintiff's GAF was 50. (*Id.*)

On October 6, 2011, Plaintiff had a psychiatric evaluation by Dr. Wehman at The Stevens Center.  (R. 326-28.)  Dr. Wehman noted that Plaintiff had seen Rose Holland on September 20, 2011, but would be referred to a different individual therapist who is available on Mondays.  (*Id.*)  Dr. Wehman recorded that Plaintiff had been hospitalized in Kansas for a suicide attempt and diagnosed with "major depressive disorder, recurrent and severe without psychotic features."  (R. 326.)  She had last been treated in Kansas in 2005 (approximately) and moved to this area in 2010 to be with her boyfriend, after having met him online in 2008.  (R. 326-27.)  In addition to the history of depression, Dr. Wehman noted that Plaintiff has panic attacks with agoraphobia.  (R. 326.) Plaintiff was not taking any medications but in the past had tried

8

Paxil, Effexor, Zoloft, Trazadone, and Ambien, all of which made here "feel like a zombie with no emotions." (*Id.*) In his "Mental Status Examination," Dr. Wehman noted the following: speech is relevant, productive, and goal directed; affect is somewhat constricted; mood is depressed; stream of thought is normal; content of thought is without delusions, phobias, suicidal or homicidal ideation; obsessions and compulsions relating to symmetry and order as well as trichotillomania; no hallucinations; cognitive functions within normal limits; partial insight; and normal judgment. (*Id.*) Dr. Wehman diagnosed Plaintiff with major depressive disorder, recurrent and severe without psychotic features, panic disorder with agoraphobia, obsessive compulsive disorder, and a GAF of 50. (R. 327-28.) He recommended that Plaintiff continue individual therapy and begin family therapy. (R. 328.) Plaintiff was to begin a trial of Luvox and begin Lorazepam. (*Id.*) She was to return for a follow-up medication visit in six weeks. (*Id.*)

On November 28, 2011, Plaintiff saw Dr. Wehman for a Medication Review. (R. 330.) Plaintiff reported medication compliance and progress.[2] (*Id.*) Dr. Wehman recorded the following: GAF of 75; relevant, productive and goal-directed speech; normal range and intensity in affect; euthymic mood; normal

[2] Some notations in the Medication Reviews conducted by Dr. Wehman are not legible. (*See* R. 329, 330, 359-62.)

stream and content of thought (with occasional obsessions or compulsions); no homicidal or suicidal ideation; no hallucinations; and generally intact cognitive and executive functions.  (*Id.*)

At a February 27, 2012, Medication Review, Dr. Wehman reported the following:  GAF of 70; relevant, productive and goal-directed speech; normal range and intensity in affect; normal stream and content of thought; no homicidal or suicidal ideation; no hallucinations; and generally intact cognitive and executive functions.  (R. 329.)  Subjectively, Plaintiff reported medication compliance, regression regarding progress, and that she is good throughout the day but gets irritable about 7 p.m.  (*Id.*)

At the May 21, 2012, Medication Review, Dr. Wehman noted that Plaintiff subjectively reported the following: "positive response to medications, but employment would not be able to be done principally because of her inability to interact with supervisors, public [and] coworkers [and] difficulty with complex instructions." (R. 361.)  Objectively, Dr. Wehman reported the following: relevant, productive and goal-directed speech; normal range and intensity in affect; euthymic mood; normal stream and content of thought; no homicidal or suicidal ideation; no hallucinations; generally intact cognitive and executive functions; and a GAF of 80.  (*Id.*)

Also on May 21, 2012, Dr. Wehman completed a "Medical Source Statement of Ability to Do Work-related Activities" form.  (R. 333-

35.)  Based on her work history and presentation, Dr. Wehman opined that Plaintiff had marked limitations in her ability to carry out complex instructions, make judgments on complex work-related decisions, and respond appropriately to usual work situations and to changes in a routine work setting.  (R. 333-34.)  Again based on work history and presentation, he found she had extreme limitations in her abilities to interact appropriately with the public, interact appropriately with supervisors, and interact appropriately with coworkers.  (R. 334.)

On August 13, 2012, Plaintiff again saw Dr. Wehman for a Medication Review.  (R. 360.)  She subjectively reported regression.  (*Id.*)  Objectively, Dr. Wehman reported the following: GAF of 60; relevant, productive and goal-directed speech; constricted affect; anxious mood; normal stream of thought; notations (illegible) as to content of thought; no homicidal or suicidal ideation; no hallucinations; and generally intact cognitive and executive functions.  (*Id.*)

At the October 8, 2012, Medication Review, Plaintiff subjectively reported no progress.  (R. 359.)  Dr. Wehman reported the following: relevant, productive, goal-directed speech; constricted affect; anxious mood; normal stream of thought; notations (illegible) as to thought content; no homicidal or suicidal ideation; no hallucinations; generally intact cognitive and executive functions; and a GAF of 60.  (*Id.*)

11

Dr. Wehman provided a Note on GAF scores:

> The GAF scores indicated in the
> Medication Review notes represent functioning
> with respect [to] psychiatric signs and
> symptoms, not necessarily social and
> occupational functioning.  In the 10-15
> minute medication check visit, the essential
> goal is to determine the patient's mental
> state and to manage medication accordingly.
> Thus, the GAF as defined above (a modified
> GAF, if you will) is a clinically more useful
> outcome measure for this function.

(R. 331, R. 364.)

### 3.   **Function Reports and ALJ Hearing Testimony**

In the "Function Report - Adult" completed on January 3, 2011, Plaintiff described her daily activities as follows: she gets up and makes coffee then gets on the computer; sometimes she does the dishes; she eats breakfast, lunch and dinner; she plays on the computer and sometimes watches movies then goes to bed; sometimes she rides with her boyfriend on his first job.  (R. 188.) Plaintiff takes care of her cat, sometimes with the help of her boyfriend.  (R. 189.)

In answer to the question of what she could do before her illnesses, injuries, or conditions that she could not presently do, Plaintiff replied that now she could not stand for more than one hour.  (*Id.*)  She also indicated she was only able to sleep for four to five hours at a time.  (*Id.*)  Plaintiff listed a variety of household chores that she does regularly, at times needing the encouragement of others, commenting that "sometimes it takes a lot

12

of motivation." (R. 190.)  Plaintiff reported that she goes out two to three times per week. (R. 191.)  She goes for food at least twice a week. (*Id.*)

Plaintiff spends time with others every day, talking and playing games together on the computer. (R. 192.)  In response to a question about getting along with others, Plaintiff responded that she fights with her daughter and sister. (R. 193.)  Plaintiff also reports that she has been more isolated since her injuries, illnesses, or conditions began. (*Id.*)

The abilities affected by Plaintiff's conditions were the following: lifting, squatting, bending, standing, walking, kneeling, stair climbing, and seeing. (*Id.*)  The following were not noted to be affected: reaching, sitting, talking, hearing, memory, completing tasks, concentration, understanding, following instructions, using hands, and getting along with others. (*Id.*)  Plaintiff reported that the activities which were limited hurt her knees "terribly" and being blind in one eye makes her depth perception "way off." (*Id.*)  Plaintiff also reported she could walk for a "couple" blocks without stopping then needed to rest for ten to fifteen minutes. (*Id.*)  Plaintiff defined her attention span as "great." (*Id.*)  She indicated that she finishes what she starts, follows written instructions very well, but is "not so good" at following spoken instructions because she is "a hands on type of person." (*Id.*)  Plaintiff reported that she gets along

"okay" with authority figures and had never been fired because of problems getting along with others. (R. 194.) Plaintiff reported that she was "not very good" at handling stress--she cries a lot and sometimes can't sleep, but her ability to handle changes in routine was average. (*Id.*) Plaintiff indicated that she had noticed unusual behaviors or fears: in crowded placed she gets really anxious and almost has panic attacks. (*Id.*)

On January 3, 2011, Jeffrey Farner completed a "Function Report Adult (Third Party)." (R. 181.) Mr. Farner was Plaintiff's boyfriend with whom she had lived since moving to Pennsylvania in 2010. (R. 30, 45.) Mr. Farner indicated that Plaintiff cannot stand for more than one hour without pain. (R. 181.) He reported that he cooks, she makes coffee and does "dishes, etc." when she can, and goes out two or three times a week. (R. 182.) Plaintiff was able to go out alone and shop once a week for one to two hours. (R. 182-83.) She socialized daily with Mr. Farner's father and her daughter by phone. (R. 184.) Plaintiff did not need to be reminded to go places and did not need anyone to accompany her. (*Id.*) The only problem indicated in getting along with others was that she fights with her daughter. (R. 185.) The abilities affected by Plaintiff's conditions were the following: lifting, standing, walking, kneeling, stair climbing, and seeing. (*Id.*) The following were not noted to be affected: bending, reaching, sitting, talking, hearing, memory, completing tasks, concentration,

understanding, following instructions, using hands, and getting along with others.  (*Id.*)  Mr. Farner reported that Plaintiff could walk for two or three blocks without stopping then needed to rest for a couple of minutes.  (*Id.*)  Plaintiff could "always" pay attention, and she "perfectly" followed written and spoken instructions.  (*Id.*)  She got along fine with authority figures and had never been fired because of problems getting along with others. (R. 186.)  Plaintiff reportedly handled stress and changes in routine "as well as anyone!"  (R. 186.)  Mr. Farner noted that he had noticed unusual behaviors or fears in Plaintiff, namely phobias.  (R. 186.)

At the October 19, 2012, hearing before ALJ Cutter, Plaintiff testified that she is married but separated from her husband and lives with her friend, Jeff Farner, who supported her for the "past couple of years."  (R. 30.)  Plaintiff said she is not able to work because of agoraphobia, panic attacks, major depression, and OCD. (R. 31.)  She was taking Lubox, Ativan, Buspar, and Ambien.  (*Id.*) She stated that the medications helped very little and they make her tired.  (*Id.*)  Regarding counseling and therapy, Plaintiff said she had last seen Rose six to eight months earlier.  (R. 33.)  She stopped going to counseling when Rose (who reportedly was an intern) left in April and Plaintiff decided she did not want to see anyone else, stating she was "tired of having to switch from one person to the next person and the next person."  (R. 49.)  When

asked if more counseling was recommended, Plaintiff stated: "He keeps asking if I've scheduled an appointment." (*Id.*)

Plaintiff also reported arthritic problems with her legs including chronic pain if she stands for too long and similar chronic problems with her knees. (R. 31-32.) Plaintiff testified that she is not able to sit or stand for more than an hour at a time. (R. 35.)

Plaintiff testified that she has anxiety "the majority of the time, it's when I'm near people." (R. 32.) She said she pulls her eyebrows out, pulls at her lip, her legs shake, and she has panic attacks where she can't breathe. (*Id.*)

On an average day, Plaintiff testifies that she gets up about five in the morning, makes coffee, gets on the computer, checks her email, plays a couple of games and reads the news. (R. 33-34.) She takes her medication about 9:30 a.m. and has breakfast. (R. 33.) Plaintiff reported that she is tired by 11:00 a.m. and she sleeps from then until 2:00 p.m. (R. 34.)

Plaintiff stated she has had depression and agoraphobia for most of her life, but did not realize it. (R. 37-38.) She confirmed that she had these conditions when she was working at the gas station in 2010. (R. 38.) Plaintiff further testified that her job was to run the cash register. (*Id.*) She worked three days per week because "that's the only openings they had." (R. 38-39.) When asked if she had a problem dealing with customers because of

the symptoms she had identified, Plaintiff responded that she did: "My skin crawled, I was irritated, and there were customer complaints." (R. 39.) Plaintiff testified that she was fired from the job for stealing from the cash register--an action she attributes to "impulsiveness." (R. 39.) Plaintiff further testified that if she had not stolen, she would still be working there, though she added that it would be hard to say if she would have been able to continue: "More than likely from my work history, I had a lot of problems with attendance. More than likely, I would have found reasons not to go to work and called in sick." (*Id.*)

Plaintiff testified that she rarely has panic attacks if she stays home. (R. 40.) She was feeling ill at the thought of attending the ALJ hearing. (R. 40-41.) Plaintiff stated she had panic attacks when she worked at the gas station but they were not as severe: she would break out into a sweat and her skin would crawl. (R. 41.) She never missed work at the gas station due to panic attacks though, before moving to Pennsylvania in 2010, she had missed the birth of her granddaughter due to her agoraphobia. (R. 42.)

Jeff Farner testified that he has been Plaintiff's boyfriend for four years and, having met on the internet, she moved here to live with him in June 2010. (R. 45.) Concerning Plaintiff's mood and behavior, Mr. Farner testified that she has good days and bad, on bad days (which she has "once every other week or so") she just

17

shuts down.  (R. 46.)  He further testified that even on good days Plaintiff has trouble leaving the house--he has to force her to go out and she does not do so without anxiety.  (R. 46-47.)  Mr. Farner stated the ratio of good to bad days has gotten better since Plaintiff has been on medications.  (R. 47.)

The ALJ asked the vocational expert to characterize Plaintiff's past work as a fast food worker, cashier, general clerk, and machine operator.  (R. 51.)  The ALJ then posed a hypothetical limiting the individual to light work with certain postural and environmental limitations as well as moderate limitations in the ability to remember, understand and carry out detailed instructions, interact appropriately with the public, supervisors or coworkers, respond appropriately to changes in the work setting, and respond appropriately to work pressures in the usual work setting.  (*Id.*)  The vocational expert testified that the hypothetical individual would be able to perform her past work as a fast food worker and would also be able to work as a "bakery worker conveyor line," a potato chip sorter, or a counter attendant at a lunch room or coffee shop.  (R. 52.)  If the previously noted moderate restrictions were considered marked restrictions, the vocational expert also testified that the counter attendant and fast food worker positions would be eliminated but the hypothetical individual would be able to work as a bakery line worker or potato chip sorter.  (R. 52-53.)  If this individual were to be off task

18

one to two hours a day, competitive employment would be eliminated. (R. 53-54.)  If the individual were to miss two days out of the month on a regular basis, the vocational expert testified that most employers would tolerate such absence.  (R. 54.)  All positions would be eliminated if the hypothetical individual had extreme limitations in the abilities previously considered moderate or marked.  (R. 53.)

**4.   ALJ Decision**

By decision of November 20, 2012, ALJ Cutter determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from December 31, 2010, through the date of the decision.  (R. 20.)  He made the following findings of fact and conclusions of law:

> 1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2012.
>
> 2.  The claimant has not engaged in substantial gainful activity since December 31, 2010, the amended alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).
>
> 3.  The claimant has the following severe impairments: affective disorders, anxiety disorders, history of fractures in bilateral lower extremities, left eye blindness and obesity (20 CFR 404.1520(c) and 416.920(c)).
>
> 4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR

404.1520(d), 404.1525, 404.1526,
416.920(d), 416.925 and 416.926).

5.  After careful consideration of the
    entire record, the undersigned finds
    that the claimant has the residual
    functional capacity to perform light
    work as defined in 20 CFR 404.1567(b)
    and 416.967(b) subject to the following.
    She is limited to work that can be
    performed sitting or standing; limited
    to occasional balancing, kneeling,
    crouching and crawling; must avoid
    concentrated exposure to temperature
    extremes; and is limited to occasional
    depth perception and accommodation.  The
    claimant has moderate limitation
    (defined as more than slight limitation,
    but the function can still be performed
    on a consistent enough basis to be
    satisfactory to an employer) in her
    ability to understand, remember and
    carry out detailed instructions;
    interact appropriately with the public,
    supervisors and coworkers; and respond
    appropriately to changes and pressures
    in a work setting.

6.  The claimant is unable to perform any
    past relevant work (20 CFR 404.1565 and
    416.965).

7.  The claimant was born on June 9, 1964
    and was 42 years old, which is defined
    as a younger individual age 18-49, on
    the alleged disability onset date (20
    CFR 404.1563 and 416.963).

8.  The claimant has at least a high school
    education and is able to communicate in
    English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not
    material to the determination of
    disability because using the Medical-
    Vocational Rules as a framework supports
    a finding that the claimant is "not
    disabled." whether or not the claimant

> > has transferable job skills (See SSR 82-
> > 41 and 20 CFR Part 404, Subpart P,
> > Appendix 2).
>
> > 10. Considering the claimant's age,
> > education, work experience, and residual
> > functional capacity, there are jobs that
> > exist in significant numbers in the
> > national economy that the claimant can
> > perform (20 CFR 404.1569, 404.1569(a),
> > 416.969, and 416.969(a)).
>
> > 11. The claimant has not been under a
> > disability, as defined in the Social
> > Security Act, from December 31, 2010,
> > through the date of this decision (20
> > CFR 404.1520(g) and 416.920(g)).

(R. 12-20.)

In making his residual functional capacity determination, the ALJ concluded that "the record as a whole does not show objective clinical findings, a degree of treatment or functional limitations consistent with disabling mental or physical impairment."  (R. 16.) He found that Plaintiff's physical and visual problems had been present for years with no evidence of serious clinical abnormalities or treatment since the alleged onset date.  (*Id.*) The ALJ found that mental health records "document mainly subjective complaints with very few objective clinical findings and limited, conservative treatment."  (R. 17.)

The ALJ noted that Dr. Wehman did not reconcile the discrepancy between the actual treatment records and the extreme limitations he assessed in the medical source statement he completed.  (R. 17.)  The ALJ found that the marked and extreme

21

limitations found by Dr. Wehman, which were based on work history and presentation, were not supported by progress notes or the record as a whole; he found that nothing in Dr. Wehman's treatment records support Plaintiff's subjective allegations.  (R. 18-19.) The ALJ noted the fact that Plaintiff "did not attend therapy in any significant fashion after the initial visit and testified she has not seen a therapist in 6-8 months."  (R. 17.)  The ALJ concluded the actual treatment records did not support more than mild to moderate limitations in the areas of remembering and carrying out detailed instructions, interacting appropriately with the public, and responding appropriately to changes in a routine work setting.  (R. 18.)  He observed that Dr. Vandergriff did not note any psychological or cognitive problems during his evaluation of Plaintiff.  (R. 18.)

The ALJ found that Plaintiff was not completely credible, in part because of the discrepancy between her function report and hearing testimony regarding psychological symptoms and difficulties with daily activities.  (R. 18.)  Similarly, the ALJ did not find Mr. Farner's statements and testimony persuasive for disability in that "they do not indicate any significant problems that support [Plaintiff] is more limited from a physical or psychological standpoint."  (R. 17.)  The ALJ referenced the statements from Plaintiff and Mr. Farner at the time of filing, finding that they did not indicate significant problems in getting along with others,

following instructions, maintaining attention, understanding and following instructions, or dealing with stress or changes in routine. (R. 19.) The ALJ also pointed to the fact that Plaintiff lost her job at the gas station because of stealing, not because of problems interacting with others. (R. 19.) Finally, the ALJ stated that even if the record supported marked limitations, the vocational expert testified there are jobs that the claimant could perform. (R. 19.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[3] It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely

---

[3] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R. 91.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  A reviewing court is

"bound by the ALJ's findings of fact if they are supported by substantial evidence in the record." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Plummer*, 186 F.3d at 427 (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011).  Therefore, we will not set aside the Commissioner's final decision if it is supported by substantial evidence, even if we would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

### A. *General Considerations*

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). These proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

Finally, the Third Circuit has recognized that it is necessary for the Secretary to analyze all evidence. If he has not done so and has not sufficiently explained the weight he has given to all

probative exhibits, "to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky*, 606 F.2d at 407. In *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981), the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected.  "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper."  *Id.* at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."  *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  Only where the ALJ rejects conflicting probative evidence must he fully explain his reasons for doing so.  *See*, *e.g.*, *Walker v. Comm'r of Soc. Sec.*, 61 F. App'x 787, 788-89 (3d Cir. 2003) (citing *Kent v. Schweiker*, 710 F.2d110, 114 (3d Cir. 1983)).  Further, the ALJ does not need to use particular language or adhere to a particular format in conducting his analysis.  *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there

27

is substantial evidence supporting the Commissioner's decision, . .

. the *Cotter* doctrine is not implicated." *Hernandez v.*

*Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir.

2004) (not precedential).

**B.   *Plaintiff's Alleged Errors***

As set out above, Plaintiff asserts the ALJ erred on three

bases: 1) the ALJ substituted his own opinion for that of

Plaintiff's treating physician; 2) the ALJ failed to explain how he

considered evidence and failed to give Dr. Wehman's opinion

controlling weight; and 3) the ALJ erred in failing to find

Plaintiff and her witness credible.  (Doc. 10 at 7.)

**1.   Consideration of Medical Evidence**

Plaintiff's first two claimed errors relate to the ALJ's

consideration of medical evidence.  (Doc. 10 at 10-13.)  They

involve three related issues: 1) whether the ALJ improperly

substituted his own opinion for that of Plaintiff's treating

physician, Dr. Wehman; 2) whether Dr. Wehman's opinion was entitled

to controlling weight; and 3) whether the ALJ properly explained

his decision. (*Id.*)  Defendant maintains that the ALJ acted in

accordance with the regulations governing treating physician's

opinions, "where the opinion is not supported by the evidence, the

ALJ should give the opinion less weight." (Doc. 11 at 13.)  We

conclude the ALJ did not err on the claimed bases.

The Court of Appeals for the Third Circuit recently addressed

a plaintiff's argument that an ALJ failed to give controlling weight to the opinion of a treating physician. *Horst v. Commissioner of Social Security*, 551 F. App'x 41, 46 (3d Cir. 2014) (not precedential).

> "Under applicable regulations and the law of this Court, opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight." *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001). Controlling weight is given when a treating physician's opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2). "Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence that he rejects and his reason(s) for discounting that evidence." *Fargnoli*, 247 F.3d at 43.

551 F. App'x at 46. *Horst* noted that neither the ALJ nor the court needed to rely on the treating physician's opinion that the plaintiff was completely disabled: "As an initial matter, 'the ALJ--not treating or examining physicians or State agency consultants--must make the ultimate disability and RFC determinations." 551 F. App'x at 46 n.7 (quoting *Chandler v. Comm'r of Social Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); citing 20 C.F.R. § 404.1527(d)). Although it is true that an ALJ's credibility judgments alone cannot override a treating physician's medical opinion that is supported by the evidence, *Morales v. Apfel*, 225 F.3d 310, 310 (3d Cir. 2003), where an ALJ relies "upon more than personal observations and credibility determinations in

discounting the treating physician's finding of disability," the ALJ does not run afoul of relevant law. *Drejka v. Commissioner of Social Security*, 61 F. App'x 778, 782 (3d Cir. 2003) (not precedential) (distinguishing *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000) (holding that an ALJ's credibility judgments alone cannot override a treating physician's medical opinion that is supported by the evidence)). *Drejka* also noted that where the treating physician made the determination the plaintiff was disabled only in a form report, the Third Circuit Court has characterized such a form report, "in which the physician's only obligation was to fill in the blanks, as 'weak evidence at best.'" 61 F. App'x at 782 (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)).

We find many aspects of Plaintiff's supporting argument problematic. In support of her assertion that Dr. Wehman's opinion is entitled to deference, Plaintiff states that "Dr. Wehman feels that it is very difficult to predict an individual's ability to work when the individual is not working and receiving mental health treatment." (Doc. 10 at 10 (citing R. 331).) This assertion is not substantiated by the record. Plaintiff's citation to the record refers to Dr. Wehman's "Note on GAF Scores" in which he states that "[t]he GAF scores indicated on Medication Review notes represent functioning with respect to psychiatric signs and symptoms, not necessarily social and occupational functioning."

30

(R. 331.)   Dr. Wehman explains that the goal of the ten to fifteen minute visit is to determine the patient's mental state and manage medication.   (*Id.*)   In Dr. Wehman's limitation regarding GAF scores, he does not opine about difficulty predicting ability to work.   Perhaps an inference can be made that Dr. Wehman recognizes the limitations of a ten to fifteen minute visit with a patient, but such an inference does not support Plaintiff's general assertion regarding predicting an individual's ability to work.

Plaintiff next asserts, without citation to the record, that "Dr. Wehman did give the opinion that, even though the Plaintiff appeared to be functioning relatively well in a clinical setting, if she was placed in a work setting he predicted she would deteriorate and have marked to extreme problems in functioning." (Doc. 10 at 11.)   This assertion is not supported by the record. Dr. Wehman opined that Plaintiff would have marked to extreme limitations in some areas of functioning (R. 333-34); he did not opine that she would deteriorate if placed in a work setting.   The opinions stated in Dr. Wehman's Medical Source Statement were based on "work history and presentation" without further explanation. (R. 333-34.)   It was Plaintiff herself who reported to Dr. Wehman that she had a positive response to medications but she would not be able to work, "principally because of her inability to interact with supervisors, public [and] coworkers [and] difficulty to complete instructions."   (R. 361.)   We cannot attribute this

31

opinion to Dr. Wehman as his own when the record shows it to be his recording of Plaintiff's subjective assessment.

Plaintiff also maintains that no evidence in the record is "directly inconsistent" with Dr. Wehman's opinion that Plaintiff has a significant psychological impairment.  (Doc. 10 at 11.) Plaintiff points to the following in support of this assertion: 1) Dr. Vandergriff noted depression and recommended that Plaintiff see a psychiatrist (*id.* at 12 (citing R. 299)); 2) Dr. Schneider noted that Plaintiff had impulse problems and impaired test judgment and diagnosed her with Bipolar Disorder and Generalized Anxiety Disorder (*id.* (citing R. 307, 308)); and 3) the State agency doctor concluded Plaintiff's symptoms were substantiated by the medical evidence (*id.* (citing R. 62)).

While these statements are supported by the record, they do not show that the ALJ erred.  First, regarding Dr. Vandergriff's and Dr. Schneider's notations, the question is not whether Plaintiff has psychological impairments for which treatment would be beneficial, the question is whether she is disabled by her impairments.  Evidence which is not "directly inconsistent" is not necessarily supportive of an opinion.  In the Social Security context, details matter--including the degree of difficulty assessed and the context in which the decision is made or the opinion is rendered.

Regarding the State agency doctor's finding that Plaintiff's

symptoms were substantiated by the evidence, the finding does not support the broad proposition that the medical evidence is consistent and there is no evidence in the record inconsistent with Dr. Wehman's limitations (Doc. 10 at 12).  The finding to which Plaintiff refers appears to have been made by SDM Hung Vo.[4]  (R. 62.)  The State agency doctor, Jonathan Rightmyer, Ph.D, found claimant's function report partially credible.  (R. 61.)  He concluded that Plaintiff's affective disorder and anxiety-related disorder caused mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in concentration, persistence or pace, and Plaintiff had no repeated episodes of decompensation, each of extended duration.  (*Id.*)  More importantly, the Disability Determination Explanation assessments regarding symptoms and credibility were made in April of 2011.  They were based only on evidence available at that time; the assessments did not include ALJ hearing testimony and the treatment records and Medical Source Statement from Dr. Wehman.  (R. 59-60.)  Thus, the State agency assessments cannot stand for the broad proposition that Plaintiff's symptoms were found to be substantiated by the medical evidence and no evidence is inconsistent with Dr. Wehman's limitations.  (Doc. 10 at 12.) This is particularly so because Plaintiff's reports of her symptoms

---

[4]  A single decision-maker ("SDM") is a non-examining, non-medical employee at the state agency level.  *Yorkus v. Astrue*, No. Civ. A. 10-2197, 2011 WL 7400189, at *4 (E.D. Pa. Feb. 28. 2011)

and the limiting effects of her conditions in the period from April 2011 to the date of the decision were not consistent with the earlier period considered in the Disability Determination Explanation.  As seen in the record evidence reviewed above and noted by the ALJ (R. 18), certain inconsistencies are apparent when Plaintiff's and Mr. Farner's January 3, 2011, function reports are compared with the October 19, 2012, hearing testimony, e.g., Plaintiff's symptoms and limiting effects of her conditions were reported to be considerably greater at the ALJ hearing.  Similarly, any inconsistencies and/or lack of support the ALJ found regarding Dr. Wehman's opinion are not undermined by the State agency symptom and credibility assessments because Dr. Wehman's records and report were not before Dr. Rightmyer or SDM Hung Vo.  Therefore, consistency and credibility determinations made in April 2011 do not support the proposition that there is no evidence in the record inconsistent with Dr. Wehman's limitations.

     Plaintiff also asserts that, pursuant to 20 C.F.R. §§ 404.1512(e) and 416.912(3), the ALJ was obligated to contact Dr. Wehman for further explanation if the ALJ thought Dr. Wehman's conclusions on Plaintiff's limitations in a work setting were inconsistent with his findings in his own clinical setting.  (Doc. 10 at 11.)  We conclude that the ALJ was under no obligation to contact Dr. Wehman pursuant to the cited regulations.  Sections 404.1512(e) and 416.912(e) address consultative examinations—an

34

issued not raised by Plaintiff.  Furthermore, as Defendant argues, applicable regulations do not support Plaintiff's position.  (Doc. 11 at 18-19.)  Regulatory provisions regarding recontacting a medical provider apply "[i]f the evidence is consistent but we have insufficient evidence to determine whether you are disabled, or if after weighing the evidence we determine we cannot reach a conclusion."  20 C.F.R. §§ 404.1520b(c)(1) and 416,920b(c)(1). Here the ALJ did not run afoul of these provisions when he considered the record adequate to make a decision.

Our review of the record reveals that the ALJ acted in accordance with relevant regulatory and statutory provisions as well as governing caselaw.  The ALJ relied "upon more than personal observations and credibility determinations in discounting the treating physician's finding of disability."  *Drejka*, 61 F. App'x at 782.  He extensively reviewed the evidence and explained his findings.  (R. 15-19.)  Citing examples, the ALJ provided reasons why Dr. Wehman's opinion was entitled to limited weight including a lack of objective clinical findings, GAF scores (taking Dr. Wehman's limitation into account),[5] limited treatment history, and inconsistencies within progress notes and between progress notes

---

[5]  The ALJ explains his use of the GAF scores and states that that "Dr. Wehman's generic explanation that he uses GAF scores primarily [as] a clinical tool for medication management does not reconcile the discrepancy between the actual treatment records and the extreme limitations assessed in a separate medical source statement."  (R. 17.)

and the opinion expressed in the Medical Source Statement.  (R. 17-18.)  The ALJ notes that Plaintiff "did not attend therapy in any significant fashion after the initial visit and testified she has not seen a therapist in 6-8 months."[6]  (R. 17.)  Pointing to the "work history and presentation" basis of the limitations found in Dr. Wehman's Medical Source Statement, the ALJ cites contrasting evidence, including the following: on the same day Dr. Wehman opined that Plaintiff had many marked and extreme limitations, the Medication Review indicates a positive response to medication, normal mental status exam and a GAF of 80; and Plaintiff had lost her last job because of stealing, not because of problems interacting with customers despite some alleged complaints.[7]  (R.

---

[6]  At the ALJ hearing in October 2012, Plaintiff testified that she had stopped going to counseling six to eight months earlier because the counselor she had seen had left and she did not want to see anyone else, adding she was "tired of having to switch from one person to the next person and the next person."  (R. 49.) When asked if more counseling was recommended, Plaintiff stated: "He keeps asking if I've scheduled an appointment."  (*Id.*)

[7]  When asked if she would still be working at the gas station if she had not stolen, Plaintiff answered "[y]es."  (R. 39.)  She was then asked if she "would have been able to continue." (*Id.*)  Plaintiff responded: "It's hard to say.  I don't know. More than likely from my work history, I had a lot of problems with attendance.  More than likely, I would have found reasons not to go to work and called in sick."  (*Id.*)

In the Disability Report, Plaintiff indicated that she stopped working on January 23, 2007.  (R. 167.)  She provided the following reason: "I was working anywhere from 10 to 12 hour shifts, was away from home a lot, it put a strain on my legs to where I could hardly move the next day, I had a disabled daughter at home with some mental problems, she needed someone there with her."  (*Id.*)

18-19.)   The ALJ further found that the statements from Plaintiff and Mr. Farner at the time of filing indicated no significant problems getting along with others, understanding and following instructions, maintaining attention, or dealing with stress or changes in routine.  (R. 19.)  Thus, the record shows the ALJ had legitimate bases upon which to discount Dr. Wehman's opinion and he explained those bases in his decision--he did not substitute his opinion for that of the treating physician and did not improperly weigh Dr. Wehman's opinion.

Plaintiff's related argument that the ALJ failed to explain how he considered evidence (Doc. 10 at 12) is also without merit. As discussed above, the ALJ explained the basis for his decision, explaining why certain evidence was not given great weight.  (R. 16-19.)  Plaintiff is correct that the ALJ did not discuss the opinions expressed in the Disability Determination Explanation (R. 58-65).  (Doc. 10 at 13.)  However, this omission is not cause for remand--the ALJ's decision is not inconsistent with the findings therein.  (R. 58-65.)  He did not fail to discuss probative evidence which he had rejected, therefore he did not run afoul of the *Cotter* rule which requires "an explanation from the ALJ of the reason why probative evidence has been rejected." *Cotter*, 642 F.2d at 706-07.

**2.   <u>Credibility</u>**

Plaintiff asserts the ALJ erred in failing to find her and her

witness credible.  (Doc. 10 at 14.)  We conclude this claimed error
is without merit.

"Credibility determinations are the province of the ALJ and
should only be disturbed on review if not supported by substantial
evidence." *Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305,
at *3 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schwieker*, 717
F.2d 871, 873 (3d Cir. 1983)).

> "[A]n ALJ's findings based on the credibility
> of the applicant are to be accorded great
> weight and deference, particularly since an
> ALJ is charged with the duty of observing a
> witness's demeanor and credibility." *Walters
> v. Commissioner of Social Sec.*, 127 F.3d 525,
> 531 (6th Cir.1997); *see also Casias v.
> Secretary of Health & Human Servs.*, 933 F.2d
> 799, 801 (10th Cir.1991) ("We defer to the
> ALJ as trier of fact, the individual
> optimally positioned to observe and assess
> witness credibility.").

*Frazier v. Apfel*, No. Civ. A. 99-CV-715, 2000 WL 288246, at *9
(E.D.Pa. March 7, 2000).  The Third Circuit Court of Appeals has
stated that "[w]e 'ordinarily defer to an ALJ's credibility
determination because he or she has the opportunity at a hearing to
assess a witness's demeanor.'"  *Coleman v. Commissioner of Social
Security*, 440 F. App'x 252, 253 (3d Cir. 2012) (not precedential)
(quoting *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)).

The Social Security Regulations provide a framework under
which a claimant's subjective complaints are to be considered.  20
C.F.R. § 404.1529.  First, symptoms, such as pain, shortness or
breath, fatigue, *et cetera,* will only be considered to affect a

38

claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. § 404.1529(b).  Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work.  20 C.F.R. § 404.1529(b).  In so doing, the medical evidence of record is considered along with the claimant's statements.  20 C.F.R. § 404.1529(b).  Social Security Ruling 96-7p gives the following instructions in evaluating  the credibility of the claimant's statements regarding his or her symptoms: "

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements.  In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true. When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

SSR 96-7p.

Here the ALJ explained why he did not find Plaintiff and Mr. Farner completely credible.  (R. 17-18.)  His reasons are supported by an independent review of the evidence.  The ALJ summarized

39

evidence related to Plaintiff's visual and lower extremity problems and found the problems had been present for years, there was no evidence of significant worsening, or that they resulted in disabling limitations.  (R. 16.)  The ALJ's review of mental health related evidence is extensive.  (R. 16-19.)  Our review of the record shows no error in his assessment that Dr. Wehman's treatment records do not support Plaintiff's subjective allegations.  (R. 19) The discrepancies between the initial function reports and later allegations noted by the ALJ (R. 18) are supported by the record. Similarly, the ALJ's reasons for finding Mr. Farner's statements and testimony less than persuasive are also supported.  The record shows that substantial evidence exists to support the ALJ's determination that Plaintiff's capacity for work is somewhat limited, but not to the extent alleged (R. 18).  Therefore, Plaintiff's claimed error regarding the ALJ's credibility determinations is without merit.

### V. Conclusion

    For the reasons set out above, we conclude Plaintiff's appeal of the Acting Commissioner's decision (Doc. 1) is properly denied. An appropriate Order is filed simultaneously with this Memorandum.


                              S/Richard P. Conaboy
                              RICHARD P. CONABOY
                              United States District Judge


DATED: September 23, 2014

                              40